UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRIN LAPINE,

        Plaintiff,

v.

CORIZON INC., et al.,

        Defendants.

_____/

Case No. 2:18-cv-10750

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [71]**

On March 6, 2018, Plaintiff Darrin LaPine filed a complaint alleging that the nineteen named Defendants and two Doe Defendants' violated his constitutional and statutory rights by providing inadequate medical treatment. ECF 1.[1] On January 22, 2019, Corizon Defendants[2] filed a motion for summary judgment. ECF 71. On February 20, 2019, Plaintiff filed a response to Corizon Defendants' motion for summary judgment. ECF 77. The Court has reviewed the briefs and finds that a

---

[1] Plaintiff has filed 15 other cases in federal district courts in Michigan. <u>Eastern District of Michigan</u>: 2:06-cv-10289, *LaPine v. Rubitschun*; 2:06-cv-12634, *LaPine v. Atterberry*; 2:15-cv-11362, *LaPine v. Romanowski*; 2:19-cv-10095, *LaPine v. Doe*. <u>Western District of Michigan</u>: 1:06-cv-00249, *LaPine v. Rubitschun*; 1:06-cv-00647, *LaPine v. Atterberry*; 1:10-cv-01272, *LaPine v. Caruso*; 1:17-cv-00768m *LaPine v. Johnson*; 1:18-cv-00102, *LaPine v. Corizon*; 1:18-cv-01147, *LaPine v. Rewerts*; 1:19-cv-00120, *LaPine v. Lincoln*; 2:09-cv-00214, *LaPine v. Caruso*; 2:10-cv-00238, *LaPine v. Chippewa Cty. Corr. Facility*; 2:14-cv-00145, *LaPine v. Savoie*; 2:17-cv-00049, *LaPine v. Waino*.

[2] Corizon Health, Inc. (F/K/A Prison Health Services) ("Corizon"); Sunhwa Choi, N.P.; Mahir Alsalman, M.D.; Jeffrey Bomber, D.O.; Steven Bergman, D.O.; Peter Watson, N.P.; and Caren Albercook, M.D.

hearing is unnecessary. E.D. Mich. LR 7.1(f)(1). The Court will grant Corizon Defendants' motion.

## BACKGROUND

On March 2, 2017,[3] Plaintiff arrived at Thumb Correctional Facility ("TCF") and notified staff that he fell down a flight of stairs at Wayne County Jail. A nurse met with Plaintiff, noted that Wayne County placed him on several medications and provided him with a wood cane, and observed a small bruise on his lower back. ECF 73, PgID 674 (under seal).[4] The nurse also documented Plaintiff's request for tennis shoes and pain medication. *Id.* (under seal).

The same day, Plaintiff sent a health care request ("kite") to prison medical staff advising that he was scheduled to go to Henry Ford Hospital for an MRI and x-rays and that he was suffering "severe pain and pinched nerves in his neck and back," described his medication needs, and requested tennis shoes. *Id.* at 675. (under seal). Prison medical staff responded that Plaintiff's chart did not have "a request or an approval for [him] to have an MRI and x-rays;" that Plaintiff was not approved for tennis shoes but would receive special medical shoes; and that MDOC had not approved prescriptions for certain medications. *Id.* (under seal). Plaintiff sent a

---

[3] All events occurred in 2017.

[4] Plaintiff repeatedly questions the authenticity of the medical records attached to Corizon Defendants' motion for summary judgment. *See, e.g.,* ECF 77, PgID 877 ("I was withdrawn [from his physician-patient relationship with Dr. Rawal] for lack of confidence, *allegedly* sent or dated 7/12/17.") (emphasis added), 878 ("It is questioned if the medical records provided *have not been altered*.") (emphasis added). Plaintiff's merely conclusory statements, without more, that the records are fraudulent or otherwise edited are insufficient to create a genuine dispute of material fact.

similar kite the next day and received a response that he had a nurse appointment scheduled. *Id.* at 677 (under seal).

On March 14, a nurse met with Plaintiff and observed that he "walked in using [a] cane but [had] no noted limp and changed [the] cane from on[e] hand to [the] other." *Id.* at 678 (under seal). The nurse also observed Plaintiff carrying a "stack of papers and binders [without] difficulty and also exchanged [them] from one hand to [the] other." *Id.* (under seal). She also detailed his comments about previous pain and treatment, and about his recent injuries and pain. *Id.* (under seal).

The next day, Plaintiff received an electromyography ("EMG") at McLaren Medical Center, which assesses muscle and nerve health. *Id.* at 683–84 (under seal) (EMG report). The EMG revealed "[m]ild to moderate carpal tunnel syndrome," "[m]ild right ulnar nerve entrapment" in Plaintiff's elbow, mild irritation in his neck, and "[m]ild peripheral sensory polyneuropathy." *Id.* at 684 (under seal).

On March 16, Plaintiff was transferred to Cooper Street Correctional Facility ("JCS"). *Id.* at 685 (under seal) (identifying JCS as the receiving facility for Plaintiff's transfer). The following day, Plaintiff sent a kite complaining of a sore back and neck problems. A nurse scheduled a nursing appointment and commented that a provider would review Plaintiff's chart within a week. *Id.* at 687 (under seal).

On March 21, another nurse met with Plaintiff and advised him that he would meet with Nurse Choi, who was reviewing his chart and EMG and would meet with him the next week. *Id.* at 688 (under seal), 690–91 (under seal) (Nurse Choi's

documentation noting that she would review the EMG with Plaintiff the following week).

The next day, Plaintiff submitted a kite requesting "to be closer to [the] chow hall." *Id.* at 692 (under seal). The following day, Dr. Alsalman advised that Plaintiff's request would be discussed at his scheduled visit with the provider. *Id.* at 693 (under seal).

On March 28, Plaintiff met with Nurse Choi for his provider visit. Nurse Choi conducted a physical exam and observed that Plaintiff had tenderness along his spine but lacked kyphosis and scoliosis. *Id.* at 696 (under seal). Plaintiff also had a limited range of motion for his right wrist. *Id.* (under seal). Nurse Choi planned to continue Plaintiff's "naprosyn/tylenol" prescription for pain, to give Plaintiff an ACE wrap for his right wrist, and to request physical therapy and an MRI. *Id.* (under seal). She also scheduled a follow-up appointment within one month. *Id.* (under seal). On March 29, Dr. Keith Papendick approved an evaluation for physical therapy, *id.* at 702 (under seal), and approved the MRI, *id.* at 706 (under seal) (noting that Plaintiff met the criteria for conducting an MRI of his lumbar spine). On March 30, an ACE wrap was issued to Plaintiff. *Id.* at 708 (under seal).

On March 31, Plaintiff sent another kite about his request for a "handicap chow detail." *Id.* at 709 (under seal). On April 4, Nurse Choi reviewed the request and approved a handicap chow detail for Plaintiff for twelve months. *Id.* at 710 (under seal).

On April 17, Plaintiff received an MRI of his lumbar spine. *Id.* at 713 (under seal). Two days later, Nurse Choi approved a handicap table with a tray assist for Plaintiff for twelve months. *Id.* at 714, 717 (under seal). The same day, a physical therapist met with Plaintiff and determined that Plaintiff had "progressed beyond the point of [physical therapy] providing any relief." *Id.* at 719 (under seal).

On April 26, Dr. Alsalman reviewed Plaintiff's MRI with him. The MRI revealed moderate to severe "central canal stenosis with foraminal encroachment." *Id.* at 722 (under seal); *see also id.* at 727–28 (under seal) (report on Plaintiff's April 17, 2017 MRI). Plaintiff's condition had deteriorated since an MRI eight years prior. *Id.* (under seal). After physically examining Plaintiff, Dr. Alsalman noted tenderness in Plaintiff's cervical and lumbar spine with severe pain with motion. *Id.* at 723 (under seal).

On May 2, Nurse Choi reiterated to Plaintiff that he was not eligible for special medical shoes. *Id.* at 729 (under seal). The same day, Plaintiff submitted a kite requesting a visit with a neurosurgeon. *Id.* at 731 (under seal). On May 3, Plaintiff sent another kite requesting a renewal of his detail for his ACE wrap and of his detail for housing. *Id.* at 732 (under seal). On May 5, Nurse Choi recommended that Plaintiff's housing detail be extended but denied his request for the ACE bandage because he was not eligible for continued use of the wrap. *Id.* at 734–35 (under seal). The same day, another nurse confirmed with the state's Assistant Chief Medical Officer that Plaintiff did not qualify for a wrist brace. *Id.* at 737 (under seal).

On May 8, Plaintiff saw Dr. Harrish Rawal for a neurosurgery consultation. *Id.* at 738 (under seal). Dr. Rawal recommended that Plaintiff receive surgery "when there is a chance of paralysis" or if he could "not stand the pain anymore." *Id.* at 743 (under seal). Dr. Rawal advised that "L2-L5 laminectomy, and fusion with instrumentation" was the recommended surgical course. *Id.* (under seal). The next day, Nurse Choi submitted a consultation request "for neurosurgery for laminectomy at L2-5 with fusion." *Id.* at 746 (under seal). The following day, Dr. Papendick approved the surgery. *Id.* at 750 (under seal). Plaintiff expressed a desire for a second opinion about surgical methods from his own doctor. *Id.* at 745, 752–53 (under seal). On May 31, Dr. Alsalman met with Plaintiff and noted that his surgery with Dr. Rawal would occur "in the near future." *Id.* at 757 (under seal).

On June 6, Plaintiff sent another kite and advised he did not want an offsite visit unless it was through his own doctors and that he had filed a lawsuit. *Id.* at 762 (under seal).

Two days later, Nurse Choi met with Plaintiff and discussed his no-show for scheduled blood work, reminded him of his upcoming neurosurgery appointment, and explained that MDOC declined his request for a second opinion for his surgical options. *Id.* at 763 (under seal).

On June 9, Plaintiff wrote a letter to Dr. Rawal describing the alternative surgery he had discussed with his own doctors. Plaintiff wrote: "What I think I will do is have you do the surgery and sue you for malepractice [sic] and gross negligence. I have learned that it would be worth millions. I won't sign off on anything. I will see

if you will perform this barbaric Neanderthal outdated type of surgery?" ECF 71-2, PgID 325.[5]

On June 14, Nurse Choi again saw Plaintiff and he agreed to a June 22 surgery with Dr. Rawal. ECF 73, PgID 770 (under seal). Nurse Choi referred Plaintiff to the Pain Management Committee ("PMC") and renewed a request for tennis shoes. *Id.* at 776, 781 (under seal).

On June 15, Nurse Choi received approval for Plaintiff to get tennis shoes, decided to decrease his Naprosyn dose and frequency "due to slightly elevated creatinine in [Plaintiff's] blood," and noted that she was waiting for the PMC response. *Id.* at 782 (under seal). Dr. Borgerding recommended stopping Plaintiff's Naprosyn intake "due to renal function tests." *Id.* at 784 (under seal). On June 16, Nurse Choi gave Plaintiff a bottom bunk with "no more than 10 steps." *Id.* at 785–87 (under seal).

On June 21, Dr. Alsalman provided Plaintiff with a vitamin B-12 shot. *Id.* at 788 (under seal). After discussing Plaintiff's neurosurgery scheduled for the next day, Dr. Alsalman noted that he believed Plaintiff was objecting to the surgery and that Plaintiff threatened to sue if the surgery occurred because it was a "more intrusive surgery than he need[ed]." *Id.* (under seal). Dr. Alsalman discussed his concerns with prison staff and Dr. Bergman. *Id.* at 789–90 (under seal). Dr. Bergman spoke with Dr. Borgerding and Dr. Bomber, and they decided to cancel Plaintiff's surgery "and

---

[5] A grievance filed by Plaintiff reinforces the point. He wrote that he "called Dr. Rawal on his method of butchering me when there is [sic] laser options so as not to leave me ruined for life," which resulted in cancellation of his surgery. ECF 71-9, PgID 469.

put it on hold until further discussions with Dr. Rawal" could occur. *Id.* at 791 (under seal). Dr. Bergman expressed that the medical staff understood that Plaintiff had "legitimate medical concerns" but that they wanted "to further evaluate if the proposed surgery is still the best course of action." *Id.* (under seal).

On June 27, Dr. Alsalman met with Plaintiff to discuss his spinal condition and noted that he felt Plaintiff's signs and symptoms were "highly questionable based on a number of surveillance video footages . . . showing [Plaintiff] freely walking without [a] cane or any sort of aid while carrying various heavy objects with no apparent distress or difficulty." *Id.* at 792 (under seal).[6] Plaintiff interrupted the appointment, handed Dr. Alsalman his attorney's business card, and left the meeting. *Id.* (under seal). Dr. Alsalman cancelled Plaintiff's details for a cell unit near the chow hall, a wooden cane, and for a handicapped tray assist. *Id.* at 793 (under seal).

The next day, Plaintiff fell in the prison yard "twist[ed] his entire body" and experienced "10/10 pain." *Id.* at 798 (under seal). Medical staff intended to send Plaintiff to an out-of-prison emergency room, but Plaintiff remained at the prison. *Id.* at 801 (under seal). A nurse provided Plaintiff with ice, Motrin, and Tylenol. *Id.* (under seal). Medical staff noted that Plaintiff refused treatment and "got up swiftly out of [the wheelchair] and walked towards [the] door" and that he was later seen "walking back to his unit independently without issue, [with] gait steady and brisk." *Id.* at 798 (under seal). The same day, Plaintiff sent a kite to medical staff about the

---

[6] Corizon Defendants did not produce the videos.

reduction of his Naproxen dosage and noted that his cane detail had been cancelled. *Id.* at 803 (under seal).

On June 29, Dr. Alsalman met with Plaintiff to assess his condition after his fall. *Id.* at 804 (under seal). Dr. Alsalman requested a reevaluation of the medical necessity of Plaintiff's proposed surgery. *Id.* at 807 (under seal). On July 3, Dr. Papendick approved the request. *Id.* at 810 (under seal). But Dr. Alsalman advised that Plaintiff's reevaluation was cancelled "per Dr. Borgerding's" recommendation because the hospital withdrew from the physician-patient relationship "due to [a] lack of confidence." *Id.* at 812 (under seal).

On July 1, a nurse met with Plaintiff after he fell in the shower. *Id.* at 814 (under seal). Plaintiff requested a cane or wheelchair, asked for his Naprosyn dosage to be increased, and reported numbness and tingling in his legs. *Id.* at 814, 817 (under seal); *see also id.* at 819 (kite message requesting Naproxen dosage increase) (under seal). Plaintiff also received a vitamin B-12 injection. *Id.* at 816 (under seal). The nurse spoke with Dr. Alsalman about Plaintiff's symptoms and Dr. Alsalman suggested that Plaintiff go to an outside emergency room. *Id.* at 817 (under seal). Plaintiff did not go to the emergency room. *Id.* (under seal). The same day, Plaintiff sent a kite asking for an update on his tennis shoes. He was told that the shoes would arrive in another 4 to 6 weeks. *Id.* at 818 (under seal).

On July 3, Plaintiff sent two kites to prison healthcare asking for the results of his EMG and MRI and for Dr. Alsalman's notes from their June 27 and 29

appointments. *Id.* at 820–21 (under seal). In a third kite, Plaintiff requested renewal of his cane detail. *Id.* at 822 (under seal).

On July 12, Dr. Rawal responded to Plaintiff's June 9 letter. Dr. Rawal noted the lack of confidence and trust that existed and advised that he and Henry Ford Allegiance were "withdrawing from [their] physician-patient relationship" with Plaintiff. ECF 71-2, PgID 323. Dr. Rawal encouraged Plaintiff to "seek out and find another physician whose advice [he would] follow in the management of [his] health care." *Id.*

On July 26, Plaintiff was transferred to Parnell Correctional Facility ("SMT"). A nurse at SMT ordered Plaintiff a cane. ECF 73, PgID 830 (under seal). The same day, a different nurse scheduled a nurse sick call to discuss Plaintiff's kite requesting pain medications. *Id.* at 831 (under seal).

On July 27, Nurse Watson evaluated Plaintiff. *Id.* at 832 (under seal). Nurse Watson observed Plaintiff "holding [his] cane, 'tapping' [the] cane onto [the] ground as he walked, not ever using [the] cane as an assistive device." *Id.* (under seal). Nurse Watson also reviewed videos from JCS showing Plaintiff walking normally. *Id.* (under seal). After conducting a physical exam and observing no signs of physical discomfort, Nurse Watson then took the cane from Plaintiff, which angered Plaintiff. *Id.* at 833 (under seal). Plaintiff left "walking quickly, [with] no antalgic gait visualized" by Nurse Watson. *Id.* (under seal).

On August 16, JCS received Plaintiff's tennis shoes and advised that they would be delivered to him at SMT. *Id.* at 837 (under seal). The same day, Dr. Albercook ordered labs. *Id.* at 838–39 (under seal).

On August 22, Plaintiff met with another doctor and again advised that he preferred for his personal physician to complete his surgery and that he "wishe[d] to pursue having [the] procedure financed through his own resources." *Id.* at 841 (under seal); *see also id.* at 842 (Plaintiff "voices his preference to have his own physician perform spinal decompression procedure using his own resources.") (under seal).

On September 12, Plaintiff complained that the tennis shoes he received lacked arch support and had very thin soles. *Id.* at 843 (under seal). A nurse responded to Plaintiff's kite and advised that he received medical tennis shoes and that he was not qualified for "custom fit tennis shoes." *Id.* (under seal).

On October 11, Dr. Albercook met with Plaintiff and noted that his anemia appeared to have been resolved. *Id.* at 844 (under seal). Dr. Albercook ordered a B-12 lab to determine the propriety of discontinuing Plaintiff's vitamin B-12 shots. *Id.* (under seal); *see also id.* at 846 (under seal).

On October 19, Plaintiff sent a kite about his tennis shoes and Nurse Watson informed him that the shoes would be delivered within 6 to 8 weeks of the order date. *Id.* at 848 (under seal).

On October 26, Dr. Albercook reviewed Plaintiff's B-12 labs and determined that his B-12 was within the normal range and that his monthly vitamin B-12

injections could be discontinued. *Id.* at 849 (under seal); *see also id.* at 851 (under seal).

On November 1, Plaintiff met with Dr. Albercook for a provider visit. *Id.* at 852 (under seal). Dr. Albercook discussed with Plaintiff his pain, his current medications, and the discontinuation of the vitamin B-12 shots. Dr. Albercook then offered to check Plaintiff's B-12 levels one month later to ensure his B-12 levels remained within a normal range. *Id.* (under seal); *see also id.* at 853 ("Monthly B12 levels [with] chart reviews to follow and restart monthly B12 injections if his blood level drops without supplementation.") (under seal).

On November 14, Plaintiff refused his lab draw. *Id.* at 856 (under seal). The next day, Dr. Albercook sent a note to Plaintiff that his B-12 blood level was within the therapeutic range and that she would not restart his monthly vitamin B-12 injections. *Id.* at 857 (under seal). She intended to recheck his levels in one month and reevaluate whether B-12 injections were necessary. *Id.* (under seal). On November 17, Dr. Albercook updated Plaintiff's medical chart and noted his refusal to take the blood draw on November 14. *Id.* at 859 (under seal).

On November 20, Plaintiff was transferred to a different facility and began receiving medical care from non-Defendant providers at that prison. *Id.* at 863 (intrasystem transfer summary) (under seal). Five months later, Plaintiff filed his complaint in this case.[7]

---

[7] Between April 2017 and August 2018, Plaintiff filed more than 30 grievances related to his medical treatment. The grievances comprise nearly 230 pages. *See* ECF 71-9, PgID 414–643. Rather than recount each grievance in the fact section, the Court will

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for purposes of summary judgment if its resolution would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)).

The Court views the facts and draws all inferences in the light most favorable to the non-moving party. *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016) (citation omitted). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And although the Court may not make credibility judgments or weigh the evidence, *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015), a mere "scintilla" of evidence is insufficient to survive summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.

## DISCUSSION

Plaintiff's claims against the Corizon Defendants fall into three broad categories: Eighth Amendment claims for deliberately indifferent medical care; First

---

refer to the grievances as necessary for consideration of Corizon Defendants' motion for summary judgment.

Amendment claims for retaliation; and claims under the Americans with Disabilities Act ("ADA"). Several of the counts relate to conduct of both Corizon Defendants and MDOC Defendants. The Court considers only the claims relevant to the Corizon Defendants and their pending motion for summary judgment.

## I.    Claims Against Corizon

Many of Plaintiff's claims allege that Corizon violated his constitutional rights. As a corporate entity in a civil rights action pursuant to 42 U.S.C. § 1983, Corizon "cannot be held liable . . . on a respondeat superior or vicarious liability basis." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992)). Rather, Corizon can be liable only for its employees' constitutional violations that were taken pursuant to an official policy, custom, or practice. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978) (holding that municipalities cannot "be held liable [except for] action pursuant to official municipal policy of some nature"); *see also Morris v. Newberry Corr. Facility*, No. 11–10938, 2013 WL 1223646, at *3 (E.D. Mich. Feb. 11, 2013) (explaining that *Monell* applies to a private corporation like Corizon and why a similar deliberate indifference claim failed against Corizon), *adopted*, 2013 WL 847520 (E.D. Mich. Mar. 7, 2013). A prisoner "must 'identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).

Plaintiff asserts that Corizon violated his rights by adopting "an unconstitutional custom[,] policy and practice" to "deny knowingly needed medical treatment, [and to] cancel prescribed procedures, referrals, and surgeries." ECF 1, PgID 15. He also includes Corizon in many of his First Amendment allegations. *See id.* at 19–20. But Plaintiff's cursory allegations, without more, do not sufficiently identify an official policy *adopted by Corizon* giving rise to his alleged constitutional harms. Plaintiff therefore fails to show that Corizon is liable under *Monell* for its employees' actions. Summary judgment in favor of Corizon is appropriate.

II.  Eighth Amendment: Deliberately Indifferent Medical Care

A prisoner's constitutional claims of inadequate medical treatment are analyzed under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To demonstrate an Eighth Amendment violation for inadequate medical care, a prisoner must show that defendants were deliberately indifferent to his serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). To succeed on a deliberate-indifference claim, a prisoner must satisfy objective and subjective prongs.

*A. Objective Prong—Legal Standard.*

Under the objective prong, a prisoner must "prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). The objective standard is met if: (1) a serious medical condition creating a serious medical need goes untreated; or (2) ongoing treatment was so inadequate as to be "so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

When arguing that treatment was so inadequate as to be "grossly incompetent," a prisoner "must 'place verifying medical evidence in the record to establish the detrimental effect' of the inadequate treatment." *Id.* at 738 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004)). Grossly inadequate care must usually be demonstrated by extensive medical evidence. *Id.* at 737–38.

Moreover, when "a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quotation omitted). Mere disagreement with treatment or a desire for additional treatment do not satisfy an Eighth Amendment claim. *Rhinehart*, 894 F.3d at 740 (quoting *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) and *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)).

B. *Subjective Prong—Legal Standard.*

Second, under the subjective prong, a prisoner must show that *each* government actor "acted with deliberate indifference." *Id.* at 738. A prisoner "must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Id.* (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). The subjective prong "requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the

inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). Circumstantial evidence may satisfy the showing, but "must present enough evidence from which a jury could conclude that each defendant . . . '*consciously* expos[ed] the [prisoner] to an *excessive* risk of *serious* harm.'" *Id.* at 738–39 (emphasis and alterations in original) (quoting *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018)).

   *C. Analysis.*

   In Count II, Plaintiff alleges that Dr. Alsalman, Dr. Bergman, Dr. Bomber, and Dr. Borgerding denied him treatment after he fell down a flight of stairs at Wayne County Jail while handcuffed to another prisoner. ECF 1, PgID 16. But Plaintiff arrived first at TCF where he reported his fall. ECF 73, PgID 674 (under seal). Then, two weeks later, Plaintiff was transferred to JCS where Corizon Defendants worked. *Id.* at 685. During his time at JCS, Corizon Defendants ordered an MRI, reviewed the MRI and EMG, and met with Plaintiff on countless occasions to discuss his medical needs. *See generally* ECF 73. Plaintiff's claim relates to the adequacy of his care. The Court hesitates to "second guess medical judgments" when "a prisoner has received some medical attention" and complains about the adequacy of that treatment. *Graham*, 358 F.3d at 385. And Plaintiff did not produce verified medical evidence of the detrimental effect of the inadequate treatment. *Rhinehart*, 894 F.3d at 738.

   In Count IV, Plaintiff alleges that Nurse Choi and Dr. Alsalman refused to provide Plaintiff with treatment for his wrist injury. ECF 1, PgID 17. In his response

brief, Plaintiff contends that on March 15, 2017, Dr. Borgerding, Dr. Alsalman, and Nurse Ausmus stated that he was "not eligible for a wrist brace" because of an MDOC policy. ECF 77, PgID 873. But on March 28, 2017, Nurse Choi provided Plaintiff with an ACE wrap for his wrist. ECF 73, PgID 696 (under seal) (ordering the ACE wrap); *id.* at 708 (under seal) (noting the ACE wrap was issued). On May 5, Nurse Choi discontinued the ACE wrap because Plaintiff was no longer eligible for its use. *See id.* at 734–35 (under seal). Michigan's Assistant Chief Medical Officer confirmed Nurse Choi's decision. *Id.* at 737 (under seal).

Here, Plaintiff's objection to the discontinuation of his wrist brace expresses a desire for additional treatment, which does not satisfy the requirements of an Eighth Amendment claim. *See Rhinehart*, 894 F.3d at 740 (quoting *Dodson*, 304 F. App'x at 440 and *Anthony*, 701 F. App'x at 464). Moreover, Plaintiff has not offered verified medical evidence establishing "the detrimental effect of the inadequate treatment." *Id.* at 738 (internal marks and quotation omitted).

In Count V, Plaintiff alleges that Dr. Alsalman, Dr. Borgerding, Dr. Bergman, and Dr. Bomber refused to provide Plaintiff with an x-ray, upper MRI or CT scan, or treatment of his upper spine. ECF 1, PgID 17. But in late-March 2017, Nurse Choi requested approval for an MRI, Dr. Papendick approved the MRI, Plaintiff received the MRI, and Dr. Alsalman reviewed the MRI results with Plaintiff. ECF 73, PgID 696, 706, 713, 723, 727–28 (under seal). Plaintiff did not receive an x-ray or CT scan. But Plaintiff's claim relates to the "adequacy of treatment" and medical care provided by prison staff, and "federal courts are generally reluctant to second guess medical

judgments and to constitutionalize claims that sound in state tort law." *Graham*, 358 F.3d at 385 (quotation omitted). In the absence of verified medical evidence demonstrating the detrimental effect of the decision to provide Plaintiff with only an MRI, the Court will not constitutionalize Plaintiff's medical malpractice claims.

In Count XI, Plaintiff alleges that Dr. Borgerding, Dr. Bomber, Dr. Bergman, and Dr. Alsalman "cancelled Plaintiff's medically necessary details for a cane, housing in a unit close to food service, and handicapped meals with tray assist." ECF 1, PgID at 19. Only Dr. Alsalman was involved in cancelling Plaintiff's details for a cane, a cell unit near the chow hall, and a handicapped tray assist. ECF 73, PgID 793 (under seal).

Plaintiff's claim regarding the cancellation of his special accommodations expresses a desire for additional (continued) treatment, which does not satisfy the requirements of an Eighth Amendment claim. *See Rhinehart*, 894 F.3d at 740 (quoting *Dodson*, 304 F. App'x at 440 and *Anthony*, 701 F. App'x at 464). Moreover, Plaintiff has not offered verified medical evidence establishing "the detrimental effect of the inadequate treatment." *Id.* at 738 (internal marks and quotation omitted).

In Count XVII, Plaintiff claims that Dr. Albercook, Dr. Borgerding, Dr. Bomber, and Dr. Bergman "denied and cancelled Plaintiff's treatment for his serious medical conditions and pain medications." ECF 1, PgID 21. Plaintiff does not provide examples distinct from his other claims to support this count. And he does not provide verified medical evidence to establish the detrimental effect of the decision of the prison medical staff. His claim fails.

In Count XVIII, Plaintiff alleges that Dr. Albercook "stopped Plaintiff's order [for] vitamin B-12 shots." *Id.*[8] Dr. Albercook terminated Plaintiff's B-12 shots because she determined that his B-12 was within the normal range. *See* ECF 73, PgID 849, 852 (under seal). Plaintiff's objection to Dr. Albercook's decision does not satisfy the requirements of an Eighth Amendment claim. *See Rhinehart*, 894 F.3d at 740 (quoting *Dodson*, 304 F. App'x at 440 and *Anthony*, 701 F. App'x at 464). Plaintiff's claim against Dr. Albercook merely second guesses her medical judgment. That is an insufficient basis for an Eighth Amendment deliberate indifference claim.

Because Plaintiff fails to satisfy the objective prong for an Eighth Amendment deliberate-indifference claim arising from inadequate medical treatment, summary judgment in favor of Corizon Defendants is appropriate.

## III. First Amendment: Retaliation

A First Amendment retaliation claim entails three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Filing grievances is protected conduct. *Annabel v. Erichsen*, 2:15-cv-10345, 2018 WL 3436726, at *13 (E.D. Mich. July 17, 2018) (citing *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996)).

---

[8] Nurse Choi is listed in the count, but Nurse Choi ordered the B-12 shots and did not participate in terminating them.

"[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake"—here, filing grievances. *Thaddeus-X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.3d 622, 625 (7th Cir. 1982)).

And for the causal-connection prong, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Maben v. Thalen*, 887 F.3d 252, 262, 267 (6th Cir. 2018) (quoting *Thaddeus-X*, 175 F.3d at 399). Circumstantial evidence like the timing of certain actions or disparate treatment may overcome a defendant's showing. *Thaddeus-X*, 175 F.3d at 399. But a plaintiff must do more than conclusorily allege misconduct by producing specific allegations or affirmative evidence to support a finding of a causal connection. *Id.* at 399–400.

Each of Plaintiff's First Amendment retaliation claims fails to satisfy at least one of these three prongs.

In Count IX, Plaintiff alleges that Nurse Choi decreased his Naproxen dosage "in conspiracy and retaliation for . . . filing grievances." ECF 1, PgID 19. First, Nurse Choi's decision to decrease Plaintiff's dosage is "so *de minimis* that [it] do[es] not rise to the level of a constitutionally cognizable injury." *Maben*, 887 F.3d at 266 (citing *Thaddeus-X*, 175 F.3d at 396). Second, even if the injury is cognizable, Nurse Choi decreased Plaintiff's medication dosage "due to slightly elevated creatinine" in his blood. ECF 73, PgID 782 (under seal). The claim fails to satisfy the prima facie case for retaliation.

In Count X, Plaintiff alleges that Dr. Borgerding, Dr. Bergman, Dr. Bomber, and Dr. Alsalman "cancelled Plaintiff's emergency surgery scheduled for his spine on 6/22/17 . . . in retaliation for grievances, complaints and letters written, regarding [his] medical issues." ECF 1, PgID 19. The claim fails. First, Plaintiff submitted his first grievance against Dr. Bergman and Dr. Bomber on November 2, 2017. *See* ECF 71-9, PgID 468–69. He filed his first grievance against Dr. Borgerding on August 16, 2017. *Id.* at 526. The grievances could not have motivated Dr. Bergman, Dr. Bomber, or Dr. Borgerding to cancel Plaintiff's surgery several months before.

Second, Dr. Alsalman produced evidence that he would have cancelled the surgery notwithstanding Plaintiff's grievances. For example, he believed that Plaintiff was objecting to the scheduled surgery because it was a "more intrusive surgery than he need[ed]." ECF 73, PgID 788 (under seal). Dr. Alsalman wished to discuss the matter with Dr. Rawal. Moreover, Plaintiff threatened to sue Dr. Rawal, which impacted the physician-patient relationship. *See* ECF 71-2, PgID 325; *see also* ECF 71-9, PgID 469 (Plaintiff's grievance noting that he "called Dr. Rawal on his method of butchering me when there is [sic] laser options so as not to leave me ruined for life"). Finally, prison medical staff wished to reevaluate Plaintiff's condition because they believed video footage showed that his symptoms were overstated. ECF 73, PgID 792 (under seal). For each of these reasons, Dr. Alsalman would have cancelled the surgery regardless of Plaintiff's protected conduct.

In Count XI, Plaintiff alleges that Dr. Borgerding, Dr. Bergman, Dr. Bomber, and Dr. Alsalman cancelled his cane detail, housing location benefit, and

handicapped meals "in retaliation for serving Dr. Mahir Alsalman with an attorney card" and for grievances against them. ECF 1, PgID 19. First, Dr. Borgerding, Dr. Bergman, and Dr. Bomber did not play a role in cancelling Plaintiff's special accommodations. *See* ECF 73, PgID 793 (under seal) (Dr. Alsalman's notes cancelling the special accommodations). And, as before, the special accommodations were cancelled before Plaintiff filed grievances against Dr. Borgerding, Dr. Bergman, and Dr. Bomber. Second, Dr. Alsalman discontinued Plaintiff's special accommodations because he determined that they were not medically necessary. ECF 73, PgID 792–93 (under seal). Plaintiff has not produced evidence to the contrary.

In Count XIII, Plaintiff alleges that Dr. Alsalman "transferred Plaintiff" from JCS to SMT "in retaliation" for grievances and complaints he filed against him. ECF 1, PgID 20. But the Security Classification Committee initiates prisoner transfers. *See* ECF 71-10, PgID 644 (MDOC policy describing transfer screening and authorization). Dr. Alsalman does not serve on the Security Classification Committee. Plaintiff's First Amendment retaliation claim for his transfer therefore fails.

In Count XIV, Plaintiff renews his allegation that his second detail for a cane was cancelled in retaliation for his grievances. ECF 1, PgID 20. He brings the claim against Dr. Borgerding, Dr. Bergman, Dr. Bomber, Dr. Alsalman, and Nurse Watson. But only Nurse Watson ordered the cancellation of his cane. ECF 73, PgID 832–33. Nurse Watson cancelled Plaintiff's cane detail because (1) Plaintiff was merely "tapping" the cane and not using it "as an assistive device," (2) he had reviewed videos

showing Plaintiff walking without a cane, and (3) a physical examination of Plaintiff revealed no signs of physical discomfort. *Id.* Plaintiff has not offered contrary evidence showing that a grievance against Nurse Watson motivated cancellation of the cane.

Furthermore, Plaintiff filed his first grievance against Nurse Watson on August 21, 2017. *See* ECF 71-9, PgID 527. The grievance could not have motivated Nurse Watson's cancellation of Plaintiff's cane detail on July 27, 2017.

In Count XVIII, Plaintiff alleges that Dr. Albercook "stopped Plaintiff's ordered vitamin B-12 shots" in retaliation "for writing grievances." ECF 1, PgID 21. Plaintiff filed his first grievance against Dr. Albercook on November 1, 2017. *See* ECF 71-9, PgID 468. Dr. Albercook decided to discontinue Plaintiff's B-12 shots on October 26, 2017 and communicated her decision to him on November 1, 2017 (which prompted his grievance). *See* ECF 73, PgID 849 (decision to discontinue B-12 shots), 852 (notes of meeting with Plaintiff about B-12 shots ending) (under seal). Plaintiff's grievance against Dr. Albercook therefore could not have motivated her discontinuation of the vitamin B-12 shots.

Because Plaintiff's First Amendment retaliation claims fail to satisfy the prima facie case, summary judgment is appropriate.

IV.     ADA Claims

Plaintiff obliquely alleges that Corizon Defendants violated the ADA. *See* ECF 1, PgID 15–21 (Counts I, IV, VII, VIII, X, XI, XIII, XIV, XVI, and XVII) (alleging

violations of the ADA, constitutional provisions, federal acts, statutes, and clearly established law).

The ADA prohibits a public entity from excluding from participation in or denying the benefits of its "services, programs, or activities," or subjecting to discrimination, a "qualified individual with a disability . . . by reason of such disability." 42 U.S.C. § 12132. In relevant part, a public entity is defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131.

"[A] private corporation is not a public entity merely because it contracts with a public entity to provide some service." *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015) (determining that Corizon Health and its employees were not public entities under the ADA) (quoting *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010)); *see also Phillips v. Tiona*, 508 F. App'x 737, 754 (10th Cir. 2013) (concluding that a private health provider that contracted with a state prison was not a "public entity" under the ADA). Because Corizon Defendants are not public entities under the ADA, Plaintiff's ADA claims against them fail.

IV.    Miscellaneous Claim

Finally, Plaintiff also claims that Corizon refused to provide him with a special diet. ECF 1, PgID 21. Plaintiff fails to allege facts to support his claim. Summary judgment in favor of Corizon is appropriate.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Corizon Defendants' motion for

summary judgment [71] is **GRANTED**.

**SO ORDERED**.

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: June 17, 2019

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on June 17, 2019, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager
